# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-0425V

|  |  |
|---|---|
| SARA MCCARTHY, | Chief Special Master Corcoran |
| Petitioner, | Filed: November 29, 2023 |
| v. |  |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |  |
| Respondent. |  |

*Brynna Gang, Kraus Law Group, LLC, Chicago, IL,* for Petitioner.

*Mitchell Jones, U.S. Department of Justice, Washington, DC,* for Respondent.

## DECISION[1]

On January 8, 2021, Sara McCarthy filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA"), as set forth in the Vaccine Injury Table, after receiving an influenza ("flu") vaccine on December 30, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons discussed below, I find that Petitioner has not established by a preponderance of the evidence that the onset of her shoulder injury occurred within 48 hours of vaccine administration, as required for a Table SIRVA claim, and therefore the claim is appropriately dismissed.

## I.     Relevant Procedural History

Well after the case's filing and activation, Respondent filed his Rule 4(c) Report in June 2022, asserting that this case was not appropriate for compensation because Petitioner could not demonstrate that the onset of her symptoms occurred within 48 hours following vaccination, as required to prevail on a Table SIRVA claim (ECF No. 27). Although the Petition did not assert a causation in fact claim, Respondent also argued that such a claim could similarly not succeed. *Id*.

Following a status conference, Petitioner was afforded the opportunity to file additional evidence in support of her claim (ECF No. 28). Petitioner thereafter filed additional medical records and affidavits (ECF Nos. 29, 32-33). On March 14, 2023, however, I determined that it did not appear that the record would support a finding that the onset of Petitioner's shoulder pain occurred within 48 hours of vaccine administration, and therefore directed Petitioner to show cause why the Petition should not be dismissed (ECF No. 34). I added that to prevail on a causation-in-fact version of the claim, Petitioner would need to file an amended petition, and otherwise establish that she could meet the elements set forth in *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005). On May 15, 2023, Petitioner filed a response to the show cause order (ECF No. 38). Petitioner did not, however, file an amended petition or seek additional time to do so.

## II.    Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Human Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v.*

3

*Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### III. Relevant Factual History

#### a. Medical Records

On December 30, 2019, Petitioner received a flu vaccine in her left arm. Ex. 12 at 1. Although the vaccine administration form was signed by Petitioner on January 7, 2019 (and hence nearly a year *prior* to vaccination), there is handwriting at the bottom of the form with the date "12-30-19" and listing the vaccine manufacturer and lot number, a situs of left arm, and the name of the administrator.[3] *Id.* The parties otherwise agree that the vaccine was administered on December 30, 2019, and I find that this is more likely than not the correct vaccination date.

There is a subsequent substantial treatment gap – with the next relevant record from August 26, 2020, when Petitioner first sought care for left shoulder pain. Ex. 8 at 17. She saw at that time orthopedic physician assistant ("PA") Joseph Perry, and complained of "LEFT shoulder pain since *February 2020*. Patient denies any specific antecedent trauma." *Id.* at 18 (emphasis added). She had difficulty with sleeping, lifting, and overhead use, and her symptoms were relieved by Aleve and rest. *Id.* She reported a pain level ranging from three to seven out of ten. *Id.* On examination, her left shoulder range of motion was 120 degrees in forward flexion, 90 degrees in abduction, and 40 degrees in external rotation. *Id.* at 20. She had tenderness at the bicipital groove and acromioclavicular joint, and positive signs on Hawkins, cross body, and impingement tests. *Id.* Her right shoulder examination was within normal limits. *Id.* She was assessed with left shoulder impingement, biceps tendinitis, and a partial-thickness rotator cuff tear. *Id.* at 20-21. PA Perry ordered an MRI. *Id.* at 21.

Four days later (August 30, 2020), an MRI showed a full thickness tear of the supraspinatus tendon, moderate partial surface tearing of the subscapularis tendon, a low grade partial tear of the infraspinatus tendon, moderate partial tear of the biceps tendon, and acromioclavicular joint arthrosis narrowing the subacromial space. Ex. 2 at 4-5.

On September 2, 2020, Petitioner returned to PA Perry to follow up and review the MRI results. Ex. 8 at 12-13. The "HPI," or history of present illness, section of the record is identical to that of the August 26th record, again stating that she reported "LEFT

---

[3] Petitioner filed additional vaccination records as Exhibit 19, but these records shed little light on the 2019 vaccination. These additional records include a flu vaccine record dated January 7, 2019 at the "Viera VA Clinic," but the portions of the record for the manufacturer and lot number of the vaccine and the name of the administrator are blank. Ex. 19 at 1-2. This record was created on March 19, 2022, and changed on July 8, 2022. *Id.* at 2. The records of Petitioner's 2020 and 2021 flu vaccines, by contrast, have additional details such as the lot number of the vaccine and the route and situs of vaccine administration. *Id.* at 3-6. Petitioner also filed emails between her and another VA employee relating to the vaccination date and record, which somewhat support the date Petitioner states she received the flu vaccine. *See* Ex. 20 at 1("[t]he appendix B states you received the shot on 12/30/19").

5

shoulder pain since February 2020." *Id.* at 13. Because she had a full thickness rotator cuff tear for over six months, he recommended left shoulder arthroscopic repair followed by physical therapy. *Id.* at 15.

Four weeks later (September 30, 2020), Petitioner saw orthopedist Dr. Richard Harrison, who works in the same office as PA Perry, for a surgical consult. Ex. 8 at 6. She had persistent discomfort of her shoulder, which she rated as six to eight out of ten. *Id.* at 7. This record has an onset date of August 26, 2020 for impingement syndrome of left shoulder and non-traumatic partial tear of left rotator cuff, and an onset date of September 30, 2020 for left bicipital tenosynovitis.[4] *Id.* It does not state what caused the pain. *Id.* The pain was worse with overhead activity and lifting. *Id.* Petitioner elected to proceed with surgery. *Id.* at 10.

On February 4, 2021, Dr. Harrison performed surgery on Petitioner's left shoulder. Ex. 14 at 28. On February 5, 2021, Petitioner attended a post-operative occupational therapy ("OT") evaluation. Ex. 13 at 3. She reported that she "started having shoulder pain January 2020." *Id.* At this time, her range of motion began to decrease, and she was unable to flex her biceps tendon. *Id.* She put off seeing a doctor due to the Covid-19 pandemic. *Id.* She reported a pain level of four out of ten, ranging to five out of ten at worst. *Id.* Her left shoulder passive range of motion was 60 degrees in flexion and 45 degrees in abduction. *Id.* at 4. Thereafter, Petitioner continued post-operative OT until June 2021, and continued to follow up with PA Perry. Exs. 13, 14.

### b. Affidavit Evidence

Petitioner has filed five affidavits in support of her claim. Exs. 9, 10, 11, 16, 18. She states that she received a flu shot in her left shoulder on December 30, 2019, at a Veterans Administration clinic, where she works as a nurse manager. Ex. 9 at ¶ 3. She noticed that the administrator "placed the needle a bit higher than usual." Ex. 18 at ¶ 6. Her left arm was "immediately very sore after vaccination." *Id.* at ¶ 7. She spoke with her daughter Jamie right after the vaccination and told her that her arm was already really sore. *Id.* She expected the pain to ease in the next few days. *Id.* at ¶ 8. Instead, within a week, the pain "was so bad that I realized I was struggling to move my arm though normal range of motion." *Id.* at ¶ 9. Over the next several weeks, her left shoulder "became more and more painful to where it was disrupting my life" and she had difficulty sleeping due to pain. Ex. 9 at ¶ 7. Petitioner also recalled telling a friend and colleague, Angela Malerk,

---

[4] The record also includes the same language as the prior two records stating that Petitioner reporting shoulder pain since February 2020, but it is marked as "Previous HPI," indicating it is copied from a prior record. Ex. 8 at 7.

about the shoulder pain at lunch in "early January 2020," and discussing it with her husband "in January 2020." Ex. 18 at ¶¶ 10, 11.

When her shoulder pain failed to improve, in late January or early February 2020 she spoke with a PA who works in an orthopedic clinic at her workplace. Exs. 9. at ¶ 8; 18 at ¶ 12. After a quick examination, he thought she might be developing shoulder impingement or bursitis and gave her a book of exercises to do at home. *Id.* Petitioner states that the document filed as Exhibit 17[5] is "the same materials that [the PA] gave me for my shoulder after I stopped him in the hallway in early 2020." Ex. 18 at ¶ 13. Because she was not a patient of his clinic, however, no medical record of their conversation was made. Ex. 9 at ¶ 9.

Over the next several weeks, Petitioner performed the exercises her colleague had instructed her about, but without improvement. Exs. 9 at ¶ 10; 18 at ¶ 14. By late February or early March 2020, she decided she needed to see a doctor about her left shoulder pain. Ex. 9 at ¶ 11. However, this coincided with stay-at-home orders and the closure of medical offices due to Covid-19. Ex. 18 at ¶ 15. At this point, she decided that she needed to deal with her shoulder pain on her own until either her shoulder or the pandemic conditions improved. Ex. 9 at ¶ 11. Over the next few months, she continued to have left shoulder and arm pain and recalled taking "a lot of Motrin." Exs. 9 at ¶ 12; 18 at ¶ 15. She continued to wake at night due to pain and have problems reaching with her left arm. Ex. 9 at ¶ 12. By the summer of 2020, she "knew I had to get in to see someone," and made an orthopedic appointment. *Id.* at ¶ 13. She states that she was unable to get in earlier due to pandemic restrictions. Ex. 18 at ¶ 16.

Petitioner states that at her initial orthopedic appointment in August 2020, she was asked when the pain started and "could not recall the exact date," but remembered that it got bad enough by February 2020 that she spoke to a colleague about it, so "I told the physician assistant that my pain got really bad in February 2020." Ex. 9 at ¶ 13. She told her orthopedist at a follow up visit that the pain first started after her flu shot and had gotten worse over time. *Id.* Petitioner states that she told Dr. Harrison that the pain started with her flu shot at her first visit with him – which was her third orthopedic appointment, and nine months after vaccination. Ex. 18 at ¶ 18. She states that the record stating that her pain *started* in February 2020 is "incorrect." Ex. 18 at ¶ 17

Petitioner's husband, Edward McCarthy, submitted an affidavit. Ex. 10. He first became aware of her left shoulder pain "sometime in mid-to-late January 2020 when she mentioned that she had been having pain for a few weeks and was having difficulty using her left arm to reach and lift." *Id.* at ¶ 2. He recalled that in late February or early March 2020, "right before Covid-19 became a real problem," Petitioner told him that she needed

---

[5] Exhibit 17 is a 17 page document titled "Shoulder Owner's Manual: Treatment for Common Shoulder Problems," and consists of educational materials and home exercises for shoulder problems.

7

to see a doctor for her shoulder pain. *Id.* at ¶¶ 4-5. However, she was then unable to do so due to the pandemic. *Id.*

Petitioner's daughter, Jamie Goodwin, also submitted an affidavit. Ex. 11. Ms. Goodwin recalls that "[r]ight after [her mom] got her flu shot in December 2019," they spoke and Petitioner told Ms. Goodwin that she was having "a bad reaction to the flu shot." *Id.* at ¶ 3. Petitioner's left arm was very painful and sore. *Id.* Petitioner again complained of pain and difficulty sleeping in January 2020. *Id.* at ¶ 4. Ms. Goodwin states that all of Petitioner's left shoulder problems "started right after she got that flu shot in December 2019." *Id.* at ¶ 6.

Petitioner's colleague and friend, Angela Malerk, submitted an affidavit in support of Petitioner. Ex. 16. Before the Covid-19 pandemic, Petitioner and Ms. Malerk ate lunch together two or three days a week. *Id.* at ¶ 4. Ms. Malerk recalled that in "early January 2020, just after the New Year, during one of our lunches together, Sara told me that her left shoulder was really painful." *Id.* at ¶ 6. Her left arm felt weak and was hard to move. *Id.* Petitioner mentioned her left shoulder pain "at every lunch date that I can remember" in January and February 2020. *Id.* at ¶ 7. Ms. Malerk recalled that Petitioner was planning to go see a physician for her shoulder, but "right after we had that conversation, everything shut down because of the pandemic." *Id.* at ¶ 8. Ms. Malerk states this was in March 2020, and by that point Petitioner had been talking about her left shoulder pain "for months." *Id.* While medical offices were closed due to the pandemic, Ms. Malerk and Petitioner frequently spoke by phone, and during "almost every call," Petitioner complained of left shoulder pain. *Id.* at ¶ 9.

### IV.     Parties' Arguments

Respondent contests only the second QAI criterion for a Table SIRVA – whether onset of Petitioner's pain occurred within the time specified, which is within 48 hours of vaccine administration. Respondent's Rule 4(c) Report, filed June 10, 2022, at *8-9 (ECF No. 27) ("Rule 4(c) Report"). Respondent observes that Petitioner did not seek care for her shoulder injury until seven months and 27 days after vaccination, at which time she reported that she had been experiencing shoulder pain "since February 2020" – which is *over a month* after vaccination. *Id.* at *8. Medical records do not reveal instances in which she reported vaccination-associated pain, nor did any of her treating providers correlate the vaccination with her alleged shoulder injury. *Id.* Respondent argues that "[o]nly petitioner has raised the possibility that her alleged shoulder injury was due to the flu vaccination," and asserts that pursuant to Section 13(a)(1), I may not award compensation based on the claims of a petitioner alone, unsubstantiated by medical records or medical opinion. *Id.* at *8-9. Respondent adds that an off-Table claim is not

8

viable because Petitioner has not offered an expert opinion in support of her claim, or other evidence establishing causation. *Id.* at *10.

Petitioner emphasizes that she has "consistently testified that her arm pain began the day of her vaccination." Petitioner's Response to Order to Show Cause, filed May 15, 2023, at *1 (ECF No. 38) ("Pet."). Petitioner's daughter filed affidavit testimony stating that she and Petitioner discussed Petitioner's shoulder pain in December 2019, shortly after the flu shot. *Id.* (*citing* Ex.11 at 1). Petitioner adds that a coworker provided affidavit testimony that "right after New Year's 2020," Petitioner discussed left arm pain during a lunch break. *Id.* (*citing* Ex. 16 at 2). And Petitioner's husband testified to discussing Petitioner's left arm pain in January 2020. *Id.* at *2 (*citing* Ex. 10 at 1).

Petitioner also acknowledges that there was "a significant period" between vaccination and her first formal medical treatment, but argues that "this formal treatment gap is entirely attributable to the emergence of the Covid-19 and subsequent Pandemic restrictions." Pet. at *2. She adds that the gap coincided with "the height of the uncertainty surrounding Covid-19 transmission and during the heart of the Covid-19 lockdowns." *Id.* During this timeframe, she underwent an informal assessment with a colleague who works as an orthopedic PA "in late January or early February 2020, prior to the Pandemic, and even produced as evidence here the booklet of shoulder exercises that [the orthopedic PA] provided to her for what he relayed to petitioner was likely either shoulder bursitis or an impingement." *Id.* (*citing* Exs. 9 at 2; 17; 18 at 3).

Petitioner further does not dispute that the initial orthopedic record for treatment of the alleged SIRVA in this case lists a February 2020 onset date – which would put onset over a month after vaccination – but argues that the evidence establishes that "this is more likely than not an inaccurate onset date notation rather than proof of a delayed onset." Pet. at *2-3. In support, she cites affidavit testimony. *Id.* Petitioner adds that a different record, her post-operative OT evaluation (Ex. 13 at 3), "support[s] an onset by January 2020," though acknowledging that the provider "did not record a more specific onset date." *Id.* With respect to the September 2, 2020 orthopedic record suggesting onset in February 2020, Petitioner states that this reference "is a word-for-word recital of the prior history and is exceedingly likely to have simply been a copy/paste of the prior visit note." *Id.* at *2-3 n.1.

Ultimately, Petitioner argues that the August 26, 2020 note referring to onset in February 2020 "conflicts with the majority of the evidence, including the affidavit testimony and the medical record from the occupational therapist, which reports an earlier onset." *Id.* at *3. Petitioner argues that medical records may be outweighed by later testimony that is "consistent, clear, cogent and compelling,"[6] and requests that I exercise discretion

---

[6] *Wood v. Sec'y of Health & Human Servs.*, No. 19-2008V, 2023 WL 2622521, at *4 (Fed. Cl. Spec. Mstr. Mar. 24, 2023) (*citing Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998).

9

and credit the "significant affidavit testimony, with supportive documentation" and medical records. *Id.* at *4.

## V.     Analysis

Petitioner has not preponderantly established that the onset of her left shoulder pain occurred within 48 hours of vaccine administration. There are no medical records supporting the allegation – in contrast to the records placing onset *well outside* of that timeframe.

Thus, the first record of treatment for Petitioner's shoulder pain (which came nearly eight months after vaccination) specifies that onset occurred in February 2020 – *over a month* after vaccination. Ex. 8 at 17. The same record states that Petitioner denied any antecedent trauma. *Id.* The OT evaluation is the best medical record in support of Petitioner's claim on this issue, but it states only that her shoulder pain started in January 2020 – which could mean January 1, January 31, or some date in between. Ex. 13 at 3. Thus, the OT evaluation arguably could provide *some* support for the onset of her pain being closer in time to vaccination than the orthopedic record. However, it does not place onset within 48 hours of vaccination. In fact, only if the record specified that the onset of Petitioner's pain occurred on the first day of January – not just *at some point* during the month of January – would it place onset within 48 hours of vaccination. Because it refers only to the month of January, without specifying a date or even whether it was early or late in the month, this record provides little support to Petitioner's claim of onset within 48 hours.

Petitioner's affidavit testimony provides *some* support for her contention that her pain began within 48 hours of vaccination. Petitioner herself states that her left arm was "immediately very sore" after vaccination. Ex. 18 at ¶ 7. And her daughter states that she talked with Petitioner "[r]ight after she got her flu shot in December 2019," and was told that Petitioner's left arm, where she received the vaccine, was "very painful and sore." Ex. 11 at ¶ 3. However, Ms. Goodwin does not explain what she means by "right after," which is non-specific and could mean on the way home from the vaccination – or could mean a week later. Such a statement in an affidavit signed over a year after the fact, and after the filing of the Petition, is not sufficient to overcome the medical record placing onset over a month after vaccination. Ms. Malerk places onset in "early January 2020, just *after* the New Year." Ex. 16 at ¶ 6 (emphasis added). Onset *after* the New Year would be more than 48 hours after vaccination, and thus outside of the Table timeframe. Petitioner's husband became aware of her shoulder problem in mid to late January 2020, when she told him she had been having pain "for a few weeks" – which could be within the Table timeframe, but also could be outside of that timeframe.

10

Moreover, the affidavit testimony stating that the onset of Petitioner's left shoulder pain occurred "immediately" after vaccination is not corroborated by independent evidence, such as medical records, and is inconsistent with the majority of the existing medical records as well. These factors further diminish the weight such testimonial evidence should be given. *See Rose v. Sec'y of Health & Human Servs.*, No. 20-0056V, 2022 WL 4128908, at *3 (Fed. Cl. Spec. Mstr. Aug. 10, 2022) (dismissing Table SIRVA claim where Petitioner stated her pain began on the day of vaccination but the medical records did not support this claim); *Eshraghi v. Sec'y of Health & Human Servs.*, No. 19-0039V, 2021 WL 2809590, at *3-4 (Fed. Cl. Spec. Mstr. June 4, 2021) (dismissing Table SIRVA claim where the petitioner did not seek care for several months and when he did the medical records made only generalized references to when his pain began).

I acknowledge that the timing of Petitioner's alleged injury, occurring in the months leading up to the Covid-19 Pandemic, may have complicated her ability to seek medical attention – and therefore explains *some* of the treatment delay. But her vaccination occurred over two months before Covid-19 was declared a Pandemic.[7] Moreover, she has not explained why she did not avail herself of alternate means of receiving care such as telephonically, through electronic messages, or telehealth, during the spring and early summer of 2020. Otherwise, the length of time without treatment is too great not to be deemed to undermine her onset contentions.

Overall, a preponderance of the evidence does not place the onset of Petitioner's left shoulder pain within 48 hours of vaccination. Thus, Petitioner's Table SIRVA claim must be dismissed.

In addition, I do not find on this record that a non-Table version of the same claim would be viable. As a threshold matter, Petitioner did not avail herself of the opportunity to allege such a claim, since she never filed an amended petition despite due opportunity. But even if she had, the same onset deficiencies (coupled with an absence of compelling expert support that could explain causation) would negatively impact the claim. It simply has not been demonstrated "more likely than not" that a SIRVA could be caused in some period of a week to a month or more post-vaccination – but not also require more immediate treatment than what transpired here.

---

[7] The World Health Organization declared COVID-19 a pandemic on March 11, 2020. Centers for Disease Control COVID-19 Timeline, at https://www.cdc.gov/museum/timeline/covid19.html (last visited Nov. 29, 2023).

## Conclusion

Petitioner has failed to establish a left shoulder injury that meets the requirements for a Table SIRVA, has not asserted that she suffered an injury that was caused in fact by the December 30, 2019 vaccination, and has not offered evidence needed to substantiate such a claim. Accordingly, this case is DISMISSED for insufficient evidence. The Clerk of Court shall enter judgment accordingly.[8]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[8] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.